UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| SEAN STEPHEN and DARYL STEPHEN, | : |
| | |
| Plaintiffs, | : |
| | : |
| -against- | :     03 CV 6226 (KAM) |
| | :     **ECF CASE** |
| P.O. JOHN HANLEY, Shield No., 13199, P.O. | : |
| EDGAR BOURDON, Shield No. 30988, | |
| SERGEANT JUAN WHITE, P.O. MICHAEL | : |
| ILIADIS, P.O. TERRANCE BRILL, P.O. | |
| PATRICK COLEMAN, P.O. DEREK | : |
| DUNSTON, P.O. RICHARD MILLER, and | |
| DETECTIVE JOSE HERNANDEZ, | : |
| | |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE
AND DEFENDANTS' VIOLATIONS OF DISCOVERY ORDERS**

MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS ....................................................................................3

A.     Defendants' Destruction of, and Failure to Produce, Certain Memo Books ......................3

B.     Defendants' Failure to Produce Documentation Related to Radio Communications..........6

C.     The Firearm Discharge/Assault Report of Detective Richard Miller .................................8

D.     Defendants' Initial Refusal to Produce, and Late Production of, Mandatory Disclosures Required by FRCP 26(a)(2)(B) ...................................................................10

ARGUMENT ................................................................................................12

I.      IN FAILING TO PRESERVE EVIDENCE DIRECTLY RELEVANT TO PLAINTIFFS' CLAIMS, DEFENDANTS ENGAGED IN SANCTIONABLE SPOLIATION ...................................................................................12

      A.     Defendants Had A Duty to Preserve Relevant Evidence......................................12

      B.     By Permitting the Loss and/or Destruction of Discoverable Evidence, Defendants Acted With A Culpable State of Mind ...............................................13

      C.     The Evidence Destroyed By Defendants Was Critical to Plaintiffs' Claims.........15

II.     AN ADVERSE-INFERENCE SANCTION IS WARRANTED TO DETER AND PUNISH DEFENDANTS' CONDUCT AND TO REMEDY THE HARM SUFFERED BY PLAINTIFFS.....................................................................................18

III.    DEFENDANTS' UNTIMELY PRODUCTION OF MANDATORY RULE 26 DISCLOSURES CONCERNING THEIR EXPERT WARRANTS SANCTIONS..........22

CONCLUSION.............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Barsoum v. NYC Housing Auth.*,
  202 F.R.D. 396 (S.D.N.Y. 2001) ...................................................................19, 21

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
  243 F.3d 93 (2d Cir. 2001)...........................................................................13, 17

*Castaldi v. Land Rover N. Am., Inc.*,
  2007 WL 4165283 (E.D.N.Y. Nov. 21, 2007).......................................................23

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991)............................................................................................19

*Chan v. Triple 8 Palace, Inc.,*
  2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005)....................................12, 14, 15, 19

*Creative Resources Group of NJ v. Creative Resources,*
  212 F.R.D. 94 (E.D.N.Y. 2002) ....................................................................21, 22

*Fujitsu Ltd. v. Federal Express Corp.,*
  247 F.3d 423 (2d Cir. 2001)...............................................................................12

*Giladi v. Strauch,*
  2001 WL 388052 (S.D.N.Y. Apr. 16, 2001)....................................................23, 24

*Golia v. Leslie Fay Co.,*
  2003 WL 21878788 (S.D.N.Y. Aug. 7, 2003)...............................................15, 21

*Grajales v. Brown,*
  2008 WL 2313137 (E.D.N.Y. June 2, 2008) ..........................................................6

*Kreyn v. Gateway Target,*
  2006 WL 3732463 (E.D.N.Y. Dec. 17, 2006) ......................................................20

*Kronish v. United States,*
  150 F.3d 112 (2d Cir. 1998)......................................................................19, 21, 22

*LaMarca v. United States,*
  31 F. Supp. 2d 110 (E.D.N.Y. 1998) ..................................................................23

*Nat'l Ass'n of Radiation Survivors v. Turnage,*
  115 F.R.D. 543 (N.D. Cal. 1987).........................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

*Pastorello v. City of New York,*
   2003 WL 1740606 (S.D.N.Y. Apr. 1, 2003)........................................................13, 14, 17, 21

*Reilly v. Natwest Markets Group,*
   181 F.3d 253 (2d Cir. 1999)........................................................................13, 14, 19

*Residential Funding Corp. v. DeGeorge Fin. Corp.,*
   306 F.3d 99 (2d Cir. 2002)........................................................................ *passim*

*Sassower v. Field,*
   973 F.2d 75 (2d Cir. 1992)........................................................................19

*Toussie v. County of Suffolk,*
   2007 WL 4565160 (E.D.N.Y. Dec. 21, 2007) ....................................................16

*Turner v. Hudson Transit Lines, Inc.,*
   142 F.R.D. 68 (S.D.N.Y. 1991) ...............................................................13, 14, 21

*U.S. v. Padilla,*
   1995 WL 261513 (S.D.N.Y. May 3, 1995) ........................................................6

*West v. Goodyear Tire & Rubber Co.,*
   167 F.3d 776 (2d Cir. 1999)........................................................................12, 19

*Zubulake v. UBS Warburg LLC,*
   200 F.R.D. 212 (S.D.N.Y. 2003) .................................................................14, 15

*Zubulake v. UBS Warburg LLC,*
   229 F.R.D. 422 (S.D.N.Y. 2004) .................................................................13, 16

**RULES**

Fed. R. Civ. P. 26........................................................................................11, 23

Fed. R. Civ. P. 26(a) ................................................................................... *passim*

Fed. R. Civ. P. 26(e) ....................................................................................18

Fed. R. Civ. P. 37(b) ....................................................................................18, 19

Fed. R. Civ. P. 37(c) ....................................................................................18, 23, 24

Plaintiffs Sean and Daryl Stephen (collectively, "the Stephens" or "Plaintiffs") hereby move for sanctions, including adverse inference instructions and costs, based on the egregious conduct of Defendants, nine New York Police Department ("NYPD") officers (collectively, the "Defendants") during discovery, which has led to the spoliation of evidence relevant to central issues in this case.

## PRELIMINARY STATEMENT

The failure to produce, or worse, the destruction of evidence is a serious offense in any litigation.  But where the victims of violence are, as a direct consequence of the brutality inflicted upon them, unable to precisely identify the perpetrators of the violence, such discovery violations deprive the victims of their ability to pursue justice.

This case arises out of the excessive use of force exerted upon Plaintiffs by Defendants during the execution of a search warrant on July 10, 2002.  Plaintiffs allege that in the pre-dawn hours of July 10, 2002, they were brutally beaten and verbally assaulted by police officers, who used vulgar language and racial epithets during a search of the apartment where Plaintiffs were sleeping.  Plaintiff Daryl Stephen ("Daryl"), only fourteen years old at the time of the incident, was brutally beaten, and knocked unconscious, suffering serious physical injury and permanent mental trauma in the form of Post Traumatic Stress Disorder ("PTSD").  Plaintiff Sean Stephen ("Sean"), who was beaten both before and after his arrest, also suffered serious physical injuries. Because of the distress suffered by the Stephens during the incident, and because Defendants entered the apartment in the dead of night, it is difficult for the Stephens to identify the individuals who participated in their assault, as well as the nature and extent of each Defendant's participation.

To substantiate and enhance their respective recollections and their case-in-chief, the Stephens have repeatedly made discovery requests of Defendants, demanding the production of critical evidence which might shed light on facts vital to the ascertainment of truth in this case. Defendants, in response, have engaged in an egregious pattern of dilatory and obstructive conduct, continually refusing to produce critical evidence, while ignoring several explicit court orders. When confronted with the specifics of their discovery failures, Defendants have provided conflicting justifications for their failure to turn over documents relevant to this litigation. Strikingly, a number of the individual Defendants have testified under oath that they never bothered to maintain or preserve evidence connected to this lawsuit. Most egregiously, one Defendant has explicitly admitted to destroying evidence over two years after the commencement of this case.[1]

Defendants' destruction of relevant evidence, their repeated refusals to produce discoverable evidence vital to Plaintiffs' case, and their untimely production of discovery has led to the instant motion. As discussed below, the evidence at issue was relevant, discoverable, and undeniably available to Defendants when this lawsuit arose – but has either not been produced, or was only produced after costly and unnecessary litigation. Moreover, a variety of facts adduced during discovery, through depositions of individual Defendants and through the conduct of Defendants' counsel suggests that at least some of the evidence not produced is missing because Defendants either intentionally destroyed it, or, at the very least, were grossly negligent in permitting its destruction or loss. Given the importance of this evidence to Plaintiffs' ability to prove its case, the imposition of sanctions is more than justified.

---

[1] Defendant White candidly admitted to having destroyed discoverable evidence years after the inception of this litigation. *See* White Tr. at 143, 60, 154.

Plaintiffs seek the imposition of sanctions against Defendants in the form of adverse inference instructions and an award of costs, based on 1) Defendants' repeated failures to comply with their discovery obligations and with Court Orders relating to the preservation and production of documents; 2) Defendants' destruction or failure to produce memo book entries or documents relating to radio communications during the July 10, 2002 incident; 3) Defendants' failure to produce information related to a shooting incident involving one of the individual Defendants; 4) Defendants' overall obstructive behavior throughout the discovery process, which has caused unnecessary and duplicative motion practice.

Additionally, Plaintiffs seek the right to conduct a supplemental deposition of Defendants' expert witness – including costs and fees to be paid by Defendants – necessitated by Defendants' tardy production of mandatory Rule 26(a) expert disclosures.

## STATEMENT OF FACTS

### A.     Defendants' Destruction of, and Failure to Produce, Certain Memo Books

To date, despite repeated requests from Plaintiffs and orders from Magistrate Judge Bloom, as well as an order from this Court, Defendants have produced memo book entries from only three of the nine police officers accused of using excessive force against Sean and Daryl Stephen.[2]

With regard to the six outstanding memo book entries, Defendants have responded with unsubstantiated, and in some cases, patently false excuses for their non-production.  For example, during a court conference at which Judge Bloom ordered the production of all outstanding memo books, Defendants' counsel argued that the New York City Police Department Emergency Services Unit ("ESU"), of which seven Defendants at issue were

---

[2] Plaintiffs have received memo book entries for Defendants Edgar Bourdon, John Hanley, and Michael Iliadis.

members, "does not maintain memo books," and that she knew this information because "I have talked to all of them."  *See* Ex. 1, Transcript of Hearing Before Judge Lois Bloom, dated May 13, 2008, at 20.

Incredibly, Defendants' counsel made this statement after having attended each of the individual Defendants' depositions, wherein a number of Defendants – specifically, members of the ESU – testified under oath that they were in fact obliged to keep and maintain memo books. For instance, Defendant Richard Miller ("Miller") – a member of the ESU – testified that officers are required to make a memo book entry for "every incident where you are present."  He also explained that an officer's memo book contained information about the "time, date, and run number" of various warrants or jobs, "the type of work we do," as well as references to any other paperwork relevant to the recorded incident.  Ex. 2, Deposition Transcript of Richard Miller, dated December 6, 2007 ("Miller Tr.") at 96-97.  Another member of the ESU, Defendant Juan White ("White") testified that his memo book included "what you do on day to day," with a level of specificity that included "what time you had a meal."  Ex. 3, Deposition Transcript of Juan White, dated February 20, 2008 ("White Tr.") at 143.  And when ESU member Defendant Terrence Brill ("Brill") was asked whether he had been instructed to preserve his memo book, he testified under oath that "[n]obody would have to ask me.  That's just a general rule."  Ex. 4, Deposition Transcript of Terence Brill, dated January 14, 2008 ("Brill Tr.") at 70.

In sum, the representations made by Defendants' counsel to Plaintiffs and to the Court – that memo books were not produced for six of the nine Defendants because they were members of an NYPD unit that did not keep such records – are clearly contradicted by the deposition testimony of Defendants Miller, White, and Brill, actual members of the ESU.  Defendants' counsel – who had been present at each Defendants' depositions, and *who had already produced*

*one memo book from an ESU member* – was clearly on notice that such a statement was incorrect. *See* Ex. 5, Defendants' Reponses and Objections to Plaintiffs' Fourth Demand for the Production of Documents, dated March 27, 2008 (producing a memo book entry for Defendant Michael Iliadis ("Iliadis"), a member of the ESU).

The representation made by Defendants' counsel's regarding purported discussions held with each Defendant regarding their memo books is also troubling, given the fact that a majority of the nine police officers testified under oath that they had either never had or could not remember ever discussing the subject of document retention or preservation with their attorney. *See* Brill Tr. at 70 (Question: "Has anyone ever asked you to preserve documents for this case?" Answer: "No."); Ex. 6, Deposition Transcript of Patrick Coleman, dated January 17, 2008 ("Coleman Tr.") at 69 (Question:  "And did [Defendants' counsel] or anyone else at the City ever ask you to preserve documents in this case?"  Answer:  "No, they did not."); Ex. 7, Deposition Transcript of Derek Dunston, dated January 9, 2008 ("Dunston Tr.") at 108 (Question:  "Okay. Has anyone ever asked you to preserve documents in relation to this case?" Answer:  "No."); Ex. 8, Deposition Transcript of Jose Hernandez ("Hernandez Tr.") at 156-157 (same).  The consequences of this preservation failure were clear during the deposition of Defendant White, who specifically testified that he had kept a memo book, that he had never been asked to turn his memo book over to his attorney, and that he had destroyed his memo book in August of 2006 – several years after the initial Complaint was filed in this case.  *See* White Tr. at 142-143, 60, 154.[3]

The deposition testimony in this case strongly suggests that each of the Defendants involved in the events giving rise to the underlying incident made contemporaneous entries in

---

[3] Perhaps not surprisingly, memo books *were* produced for Defendants Bourdon and Hanley, the only two Defendants that did recall a conversation with their attorney regarding the production of their memo books.

their memo books recording the events of July 10, 2002.  Given the fact that only three memo

books have been produced to date, the logical presumption is that six memo book entries

recording the details of the July 10, 2002 incident at issue in this case existed, but have either

been withheld from production, lost, or destroyed.  Moreover, the deposition testimony of a

number of the Defendants raises serious questions about the adequacy of Defendants'

preservation efforts.

**B.     Defendants' Failure to Produce Documentation Related to Radio Communications**

Radio communications between police officers are often of significant importance in §

1983 actions.  Transmissions from one police officer to another, requesting back up or

assistance, can substantiate grounds for behavior which may otherwise normally be thought of as

violating a citizen's rights.  Defendants do not dispute that records describing or relating to radio

communications between the police officers made during the execution of the July 10, 2002

warrant existed, as it is the routine practice of the NYPD to keep such records.  *See*, *e.g.*, *U.S. v.*

*Padilla*, 1995 WL 261513, at *1 (S.D.N.Y. May 3, 1995) (providing a brief description of

records kept by the NYPD relating to radio communications).  Moreover, it is written

documentation of radio communications (rather than audio tapes), known as "Incident Records,"

or "Sprint reports", that are most likely the only available evidence of radio communications

relating to the July 10, 2002 incident, as the underlying dispatchers' taped calls were likely

destroyed as a matter of NYPD routine.  *See id.* at *1 ("911 operators' conversations with

citizens and dispatchers' conversations with officers in the field are all tape recorded. But those

tape recordings are routinely destroyed by the NYPD after 90 days"); *see also Grajales v.*

*Brown*, 2008 WL 2313137, at *2 (E.D.N.Y., June 2, 2008) (describing "the police department's

standard policy" as "destroying such [audio] recordings if they have not been the subject of a

6

subpoena within 90 days.").  In the instant case, Defendants have failed to produce any documents in response to Plaintiffs' repeated requests for documentation related to radio communications about the underlying incident.

As late as March of 2008, Defendants' response to Plaintiffs' requests for documents related to radio communications was only that Defendants were "continuing to search" for "any and all documents concerning radio communications that were recorded on the day of the incident in question."  *See* Ex. 5, at 2.  Over a month later, Plaintiffs again requested the production of all outstanding discovery, including documents related to radio communications. Ex. 9, Ltr. from D. McGill to B. Birnbaum dated May 16, 2008.  On May 30, 2008, Defendants responded, but ignored the issue of the missing radio communications documentation.  Ex. 10, Ltr. from B. Birnbaum to D. McGill, dated May 30, 2008.

Defendants have responded to Plaintiffs' most recent request for documents relating to radio communications by stating only that "Defendants are not in possession of any radio communications which relate to the incident."  *See* Ex. 11, Ltr. From A. Saleem to D. McGill, dated January 27, 2009.  Such a response is deficient in two respects.  First, Defendants' response references only "radio communications", while Plaintiffs' request clearly sought "*documents concerning radio communications* that were recorded on the day of the incident in question and which relate to the July 10, 2002 incident at issue in this case."  Ex. 12, Letter From D. McGill to A. Saleem, dated January 13, 2009.  Second, Defendants' response fails to comply with this Court's explicit Order, which directed Defendants to produce outstanding discovery "and, for any documents that could not be produced, *provide the plaintiffs with a certified statement that, after a good-faith diligent search, the documents could not be located*."  Minute Entry dated January 12, 2009 (emphasis added).

7

**C.    The Firearm Discharge/Assault Report of Detective Richard Miller**

After numerous requests, two in-person depositions, one deposition by written questions, a motion to compel, and several court orders, Defendants have finally disclosed certain documents related to Defendant Miller's involvement in a shooting incident – months after discovery in this case was closed.  Yet, Defendants still have not produced *any* documents related to Plaintiffs' original discovery request for the production of IAB reports, IAB documents or other documents related to the 1989 incident in which Defendant Miller discharged his firearm, killing a suspect.  *See* Ex. 13,  Ltr. from D. McGill to B. Birnbaum, dated June 20, 2008 (noting Plaintiffs' repeated requests for such information).

At his December 6, 2007 deposition, Defendant Miller revealed that, in 1989, as a result of a "discharge of a firearm investigation," he was temporarily transferred to an administrative position in the NYPD, but was improperly instructed by Defendants' counsel not to answer questions related to the shooting on the grounds that such information was "irrelevant."  Miller Tr. at 32-33; 41-42.  Unable to discern whether the incident involved any allegations or findings that excessive force was used – a clearly relevant issue in this case – Plaintiffs obtained a Court Order requiring Defendant Miller to answer written deposition questions related to the shooting incident.  *See* Ex. 14, Transcript of Status Conference, dated February 12, 2008 at 44.  Although the written response admitted that the IAB and the grand jury investigated the incident, it contained a number of baseless objections previously overruled by the Court.  Plaintiffs' attempts to resolve the issue without resort to judicial intervention failed – prompting further litigation and *another* order from Judge Bloom requiring Defendant Miller to appear for a *second* in-person deposition, where he would be required to answer any and all questions related to the

shooting at issue.  *See* Ex. 15, Ltr. from D. McGill to the Hon. L. Bloom, dated April 11, 2008 (DE 148), at 2; *see also* Ex. 1 at 3-4.

In preparation for Defendant Miller's re-deposition, Plaintiffs again requested documents relating to the shooting incident or the subsequent investigations, but were met with blanket denials from Defendants, who claimed that "defendants are not in possession of any documentation regarding Detective Miller's discharge of a firearm in April 1989."  *See* Ex. 16, Email from B. Birnbaum to D. McGill, dated June 16, 2008.

At his second in-person deposition, Defendant Miller testified, consistent with his written answers, that the IAB and a grand jury had in fact investigated the 1989 shooting incident in which Miller had shot and killed an individual.  Miller Tr. at 250-254, 271-272.  After Defendant Miller's second deposition, Plaintiffs repeatedly requested all documents related to the shooting or the subsequent investigations, but received no response from Defendants.  *See* Ex. 13. Defendants – despite their indifference to Plaintiffs' requests – expressed surprise months later, at a status conference before this Court, when Plaintiffs noted their intention to move for sanctions based on Defendants' failure to produce a variety of documents, including documents associated with investigations of Defendant Miller's firearm discharge.

As per the Court's order at that status conference, Plaintiffs compiled for Defendants a list of outstanding discovery to be produced.  *See* Ex. 11.  Based on the limited information available to them, Plaintiffs assumed that the document identified as a "Firearm Discharge/Assault Report" and listed in Defendants' privilege log under Miller's name was a report of the investigation into the shooting Miller had described in his depositions.  *See* Ex. 17 at 6 (entry for document Bates numbered 1586).  On January 27, 2009, despite their previous representation regarding privilege, Defendants produced documents relating to the "Firearm

Discharge/Assault Report" that were clearly not privileged, raising serious questions about what other documents responsive to Plaintiffs' requests have gone unproduced.  Moreover, a cursory review of these documents revealed that they related to a firearm discharge that occurred in 2001, and had no relation to the investigations into the 1989 shooting incident Defendant Miller described in his depositions.  Thus, despite 13 months of litigation and numerous Court Orders, Defendants' have still not produced any documents concerning the investigations surrounding the fatal shooting involving Defendant Miller.[4]

**D.      Defendants' Initial Refusal to Produce, and Late Production of, Mandatory Disclosures Required by FRCP 26(a)(2)(B)**

In preparation for trial, Plaintiffs retained an expert witness in the field of forensic psychiatry, and provided Defendants with a copy of their expert report on January 31, 2008. Pursuant to the requirements of FRCP 26(a)(2)(B), Plaintiffs' expert report contained a complete statement of all opinions to be expressed by Plaintiffs' expert, the basis and reasons for his opinions, and a list of the data and other information he had considered in forming his opinions. In order to comply fully with the requirements of FRCP 26(a)(2)(B), Plaintiffs supplemented their expert disclosures with an affidavit from their expert on February 4, 2008 – over a month before his deposition – setting forth his testifying history, his compensation in connection with the case, and enclosing his *curriculum vitae*, which contained a list of his publications.  *See* Ex. 18, Ltr. from Jordan Rosenfeld to Brooke Birnbaum, dated February 4, 2008.

On March 21, 2008, Defendants produced their own expert report, authored by Dr. Alex Weintrob, a psychiatrist licensed to practice medicine in the State of New York.  Dr. Weintrob's expert report did not include any mention of publications authored by Dr. Weintrob, the names

---

[4] Given Defendant Miller has himself confirmed that there were IAB and grand jury investigations into the shooting that resulted in a fatality, it is difficult to believe that no documents concerning these investigations exist. Specifically, Defendants have not produced the IAB reports or accompanying IAB documents relating to the IAB investigation of the 1989 shooting incident, despite Plaintiffs' repeated requests.

of any cases in which he had previously testified, nor a statement of his compensation in the

case.  At his deposition, Dr. Weintrob admitted that he had testified as an expert witness in

several cases within the last four years, but refused to identify any cases in which he had

previously testified as an expert.  Weintrob Tr. at 28-31, 258-59, 262.  It was not until the end of

Dr. Weintrob's deposition – and only then in response to a request from Plaintiffs' counsel – that

Defendants belatedly produced a copy of Dr. Weintrob's resume, which contained a list of

publications he had authored.  *See id.* at 254-55.  When asked specific questions regarding his

compensation in connection with the case, Dr. Weintrob disclosed his hourly rate, but noted that

he had not yet billed Defendants and that he did not know exactly how long he had worked on

the case.  *Id.* at 25-26.

Subsequently, on April 3, 2008, Plaintiffs sent a letter to Defendants "to address

Defendants' failure to make the necessary disclosures concerning Dr. Alex Weintrob, as required

by Rule 26 of the Federal Rules of Civil Procedure."  *See* Ex. 19, Ltr. from David McGill to

Brooke Birnbaum dated April 3, 2008.  In that letter, Plaintiffs listed the disclosures required by

Rule 26, and specifically requested a complete list of cases "in which Dr. Weintrob has testified

as an expert within the last four years."  *See id.*  In response, Defendants refused to provide the

information requested because "it is [Dr. Weintrob's] belief that these matters are not public and

therefore, he [does] not feel comfortable providing information about them," and claiming that

Dr. Weintrob's testifying history "is clearly irrelevant."  *See* Ex. 20, Ltr. from B. Birnbaum to D.

McGill dated April 4, 2008.  Despite this written record, Defendants appeared at a status

conference before this Court eight months later, and expressed surprise when Plaintiffs noted

their intention to move for sanctions based on Defendants' failure to produce a variety of

documents, including Defendants' Rule 26 expert disclosures.

As per the Court's order at that status conference, Plaintiffs compiled for Defendants a list of outstanding discovery to be produced, s*ee* Ex. 12, and on January 27, 2009, without reference to their previous written refusals on the subject, Defendants produced Dr. Goldsmith's testifying history.  *See* Ex. 11.

## ARGUMENT

I.   **IN FAILING TO PRESERVE EVIDENCE DIRECTLY RELEVANT TO PLAINTIFFS' CLAIMS, DEFENDANTS ENGAGED IN SANCTIONABLE SPOLIATION**

The law is clear in this Circuit that "spoliation" – "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation" – is sanctionable conduct.  *West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir. 1999).  A party seeking sanctions for spoliation of evidence must establish three elements, namely (i) an obligation to preserve evidence at the time it was destroyed, (ii) a culpable state of mind, defined as including negligent, grossly negligent or intentional conduct, and (iii) the destruction of potentially relevant documents that reasonably would support the claim or defense. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).  Each of these elements is satisfied in the instant case.

A.   **Defendants Had A Duty to Preserve Relevant Evidence**

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *Fujitsu Ltd. v. Federal Express Corp*., 247 F.3d 423, 436 (2d Cir. 2001).  At a minimum, therefore, the actual filing of a suit triggers an obligation to preserve relevant evidence.  *See, e.g., Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579, at *5 (S.D.N.Y. Aug. 11, 2005).  This means that from at least the time a complaint is filed, the defendant "is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably

12

calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested

during discovery and/or is the subject of a pending discovery request." *Turner v. Hudson Transit*

*Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991).  In the instant case, Defendants' duty to preserve

documents connected with the July 10, 2002 incident and documents concerning the shooting

incident involving Defendant Miller was triggered, at the very latest, by the filing of the initial

Complaint.  *See, e.g.*, *Pastorello v. City of New York*, 2003 WL 1740606, at 9 (S.D.N.Y. Apr. 1,

2003) (stating the duty to preserve memo books arises "no later" than the date on which the

notice of the claim is filed).

### B.    By Permitting the Loss and/or Destruction of Discoverable Evidence, Defendants Acted With A Culpable State of Mind

The law is clear in this Circuit that a range of mental states are sufficient to satisfy the

"culpable state of mind" requirement.  Although destruction of the discovery materials in "bad

faith," "intentionally," or with "gross negligence" is clearly *sufficient* to establish culpability,

*see, e.g., Reilly v. Natwest Markets Group*, 181 F.3d 253, 267 (2d Cir. 1999), those states of

mind are not necessary for sanctions to be warranted.  *See Byrnie v. Town of Cromwell, Bd. of*

*Educ.*, 243 F.3d 93, 109 (2d Cir. 2001) (holding that "bad faith – an intent to obstruct the

opposing party's case – need not be shown to justify an inference of spoliation").  Indeed, the

Second Circuit expressly has held that sanctions for spoliation "may be appropriate in some

cases involving the negligent destruction of evidence because each party should bear the risk of

its own negligence." *Residential Funding*, 306 F.3d at 108; *see also Zubulake v. UBS Warburg*

*LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) ("In this Circuit, a 'culpable state of mind' for

purposes of a spoliation inference includes ordinary negligence.").

The Defendants' conduct in this case was negligent, at the very least.  Defendants

have failed to produce memo books for the majority of Defendants, and Defendant White has

testified affirmatively to destroying his memo book years after the duty to preserve was

triggered.  As Judge Scheindlin has recognized, "[o]nce the duty to preserve attaches, any

destruction of documents is, at a minimum, negligent."  *Zubulake v. UBS Warburg LLC*, 220

F.R.D. 212, 220 (S.D.N.Y. 2003).  Moreover, allowing sanctions based on negligence comports

with the remedial purposes of the spoliation doctrine, as "[i]t makes little difference to the party

victimized by the destruction of evidence whether that act was done willfully or negligently."

*Residential Funding*, 306 F.3d at 108 (quoting *Turner*, 142 F.R.D. at 75).  And sanctions are

imposed in such cases "not because of any finding of moral culpability, but because the risk that

the evidence would have been detrimental rather than favorable should fall on the party

responsible for its loss."  *Id.*; *see also Reilly*, 181 F.3d at 267-68.

    Though this showing of negligence is sufficient to demonstrate Defendants'

culpability, there is clear evidence here not just that Defendants and their counsel were negligent,

but that they were *grossly* negligent in their disregard for the retention requirements for

discovery documents related to this case.  The most obvious failing is that the majority of

Defendants in this case appear to have made no attempts to maintain records or preserve relevant

documents for this case.  *Pastorello*, 2003 WL 1740606, at *9 ("That this duty to advise the

client was neglected is evident in [the attorney]'s complete failure to either ask the police what

kinds of records they maintained or … to uncover the existence of records.").[5]  For instance,

Defendants Brill, Coleman, Dunston, Hernandez and White each testified at their depositions

that they were never informed of the need to preserve any documents related to this case.  From

---

[5] It is worth noting that the Defendants' alleged lack of knowledge about the lawsuit or their need to preserve is not a defense in a spoliation action.  *See Chan*, 2005 WL 1925579, at *6 (citing *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557-58 (N.D. Cal. 1987) ("It is no defense to suggest…that particular employees were not on notice.  To hold otherwise would permit an agency, corporate officer, or legal department to shield itself from discovery obligations by keeping its employees ignorant.  The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations to employees in possession of discoverable materials.").

their testimony, it is clear that the majority of the Defendants failed to institute a litigation hold, and as a result, relevant evidence was destroyed.  No explanation has ever been offered for this failure.

Defendants' failure to preserve relevant evidence in this case goes against the established rule that "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake*, 200 F.R.D. at 218.  Where a parties' failure to meet its obligations results in the destruction of evidence, sanctions are warranted.  And, as in this case, "the utter failure to establish any form of litigation hold at the outset of litigation is *grossly negligent*." *Chan,* 2005 WL 1925579, at *7, (citing *Golia v. Leslie Fay Co.*, 2003 WL 21878788, at *9 (S.D.N.Y. Aug. 7, 2003) ) (emphasis added).

Moreover, it bears noting that Officer White's admitted destruction of his memo book, years after the commencement of this lawsuit, renders Defendants sufficiently culpable for its destruction to warrant sanctions.  White, like the other Defendants, had a duty to preserve his memo book.  His situation differs from the other six Defendants who have not turned over their memo books because he testified both to (a) the existence of his memo book at the time the litigation arose and at the time various discovery requests were filed and answered; and (b) the destruction of his memo book in 2006, years after such responsive documents had been requested by Plaintiffs. This conduct, in and of itself, constitutes "the essence of spoliation." *See Chan*, 2005 WL 1925579, at *5.

## C.    The Evidence Destroyed By Defendants Was Critical to Plaintiffs' Claims

Finally, to warrant sanctions for spoliation, the party alleging the spoliation must establish that the missing documents were relevant evidence and that the destroyed evidence

would have been favorable to them. *Toussie v. County of Suffolk*, 2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007).

Relevance in this context may be established in two ways:  First, it may be inferred if the spoliator is shown to have a sufficiently culpable state of mind.  Whereas a party seeking to establish spoliation must normally establish that the missing documents were relevant evidence and would have been favorable to them, a showing of willfulness in the destruction of evidence will by itself suffice to support a finding that the evidence was unfavorable to the spoliator.  In cases where the spoliator acted with bad faith, courts find it unnecessary to undertake a relevance analysis, finding the bad-faith destruction of evidence in and of itself sufficient to satisfy the third-prong of the spoliation test.  *See Residential Funding*, 306 F.3d at 109 ("Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party."); *Zubulake*, 229 F.R.D. at 431 (same).  As discussed above, this inference is clearly appropriate with regard to the memo books that Defendants inexplicably failed to preserve and produce.

The spoliator may also be shown to have a sufficiently culpable state of mind if the party asserting spoliation can demonstrate gross negligence. "[A] showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." *Residential Funding*, 306 F.3d at 109.  Should this Court find that Defendants' non-production of the missing evidence constitutes gross negligence, as discussed *supra*, then the relevance analysis is no longer required for an adverse inference instruction to be granted.

The second way to establish relevance is for the moving party to submit extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to it. *See Byrnie*, 243 F.3d at 109-10.  There is sufficient evidence in the record to conclude that the destroyed or missing evidence would have been relevant and favorable to Plaintiffs' case.

First, the helpfulness of the missing or destroyed memo books – as defined by Defendants' description of the NYPD's procedural guidelines – has been articulated.  These memo books could have identified the relevant police officers, provided background information, corroborated the Stephens' account of what occurred, or refreshed the individual Defendants' recollections at their depositions.  Second, based upon the Stephens' recollection of the July 10, 2002 events, had an officer made an entry in his memo book, such an entry could have been pivotal in locating a potential witness and validating the Stephens' recollection of the incidents.  Third, the existence of records relating to the warrant and its execution seem to strongly suggest that the event would merit the recording of the incident by the officers, and would reference Plaintiffs.[6]

The missing July 10, 2002 memo book entries and documents relating to radio correspondence about the incident could have been essential in doing a number of things:

---

[6] Defendants provided memo book entries for three Defendants, and will likely argue that these entries evidence what the others would have looked like (in order to support a claim that the destroyed/missing evidence was irrelevant).  However, relevant language of a recent Southern District case  speaks directly to this point:

> [T]wo memo books are not all the memo books, and examples of some entries are poor evidence of the irrelevancy of the undisclosed memo books.  Moreover, As the Second Circuit has recently held, 'a showing of gross negligence in the *destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party*…. [T]hat same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the "relevance" factor).

*Pastorello*, 2003 WL 1740606at *13 (citing *Residential Funding*, 306 F.3d at 109) (internal citation omitted) (emphasis added).

identifying a potential witness, identifying the Defendants, affirming the Stephens' recollections, or indicating the conditions under which the Stephens were during the search warrant execution. Such information is critical in this case, where Plaintiffs, given their poor physical and emotional conditions following Defendants' assaults, are unable to recall with specificity many of the details of their attack; and of the nine Defendants, all of whom participated to some degree in the execution of the warrant upon the Sterling Place residence, almost none were able to articulate any recollection of Defendants or of their arrest.

Defendants' have indicated in the Joint Pre-Trial Order (DE 175) that they will raise as a defense a trial that "Plaintiffs have failed to establish that each and every defendant had personal involvement in the incident which is the subject of this action."  Thus, the roles of each officer and the extent of their involvement in the attack upon the Stephens or the subsequent arrest of Sean Stephen, are very much at issue.  Therefore, the existence of any evidence which may tend to make the Stephens' claims against each officer more or less probable is of the utmost significance in this case.

## II.    AN ADVERSE-INFERENCE SANCTION IS WARRANTED TO DETER AND PUNISH DEFENDANTS' CONDUCT AND TO REMEDY THE HARM SUFFERED BY PLAINTIFFS

Rule 37 of the Federal Rules of Civil Procedure authorizes a court to sanction a party who "fails to obey an order to provide or permit discovery," or who, "without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(2)."  Fed. R. Civ. P. 37(b)(2), (c)(1).   For either failure, the authorized sanctions under Rule 37(b) include, among other options:  an order establishing facts related to the discovery abuse, prohibiting the disobedient party from supporting or opposing related claims and defenses, striking out pleadings or parts thereof, or entering a default judgment against the disobedient party.

Under both Fed. R. Civ. P. 37(b) and through exercise of its "inherent power to control litigation," this Court has "broad discretion" to craft an appropriate sanction for Defendants' destruction of evidence and their failure to produce. *West*, 167 F.3d at 779 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991) and *Sassower v. Field*, 973 F.2d 75, 80-81 (2d Cir. 1992)). The Second Circuit recently reiterated a court's general power to impose sanctions in the discovery context, holding that where "the nature of the alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction." *See Residential Funding*, 306 F.3d at 107. Sanctions may be appropriate regardless of whether the spoliator acted willfully, with gross negligence, or merely with ordinary negligence. *See Chan*, 2005 WL 1925579, at *6.

The applicable sanction for the spoliation of evidence "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West*, 167 F.3d at 779; *see also Reilly*, 181 F.3d at 267-68 (characterizing the cases in this area as taking a "case-by-case approach," and recommending that trial courts "should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing – a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case"). In other words, the sanction should aim to (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the parties who wrongfully created that risk; and (3) restore the prejudiced party to the same position it would have been in had the spoliation not occurred. *Id.*; *see also Kronish v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998); *Barsoum v. NYC Housing Auth.*, 202 F.R.D. 396, 399 (S.D.N.Y. 2001).

Based on Defendants' destruction of and/or non-production of evidence, this Court should grant an adverse inference instruction to the jury at the trial. Such an instruction tells the

jury that, if a party has control over a piece of evidence and fails to retain or produce it, the jury should presume that the evidence would have been unfavorable to the party who controlled the evidence.  As discussed in more detail below, an adverse inference instruction regarding spoliation of evidence is proper when a party has deliberately destroyed evidence or has failed to either produce relevant evidence or explain its non-production.  This form of sanction is perhaps the most "commonly imposed remedy" for spoliation. *Kreyn v. Gateway Target*, 2006 WL 3732463, at *1 (E.D.N.Y. Dec. 17, 2006).

The purpose of an adverse inference instruction is to remedy litigation misconduct; specifically, to cure the evidentiary inadequacies caused by a party's spoliation, to deter said party from discarding relevant evidence in the future, and to place the burden of the risk of erroneous judgment on the abusive party.  In this case, Defendants are the only party who have access to evidence which could shed light on the events at issue in this litigation, and therefore their compliance with Plaintiffs' reasonable and repeated requests for such documents is essential to the resolution of this dispute; and their egregious failure to do so warrants an adverse inference instruction.  Plaintiffs' inability to identify with consistent specificity the individuals who attacked them or details about their assault is a direct result of the injuries they received and the circumstances surrounding their assault during the execution of the search warrant. Therefore, as discussed in more detail below, the sanction most likely to cure the evidentiary deficiencies in this case is an adverse inference instruction.

First, while the plainly willful admitted destruction of Defendant White's memo book and the clear failure to preserve the memo books of five other Defendants may warrant a sanction even harsher than adverse inference, the unexplained and unjustified non-production of documentation relating to radio correspondence and the documents pertaining to the IAB and

20

grand jury investigations of Defendants Miller was, at a minimum, grossly negligent.  A showing of gross negligence is plainly enough to justify sanctions at least as serious an adverse inference. *See Residential Funding*, 306 F.3d at 108; *Golia*, 2003 WL 21878788, at *9-11; *Barsoum*, 202 F.R.D. at 400;  *see also Pastorello*, 2003 WL 1740606, at*13 n.8 ("If negligent non-production merits an adverse inference charge, grossly negligent spoliation does so *a fortiori*.").

Second, this Court should find that Defendants' counsel's conduct in particular constituted gross negligence, and therefore an adverse inference sanction is warranted.  Even if Defendants' counsel:

> did not destroy evidence, and [her] failure to produce the documents is viewed as just that – a failure to produce – *an adverse inference instruction is still warranted*. [Counsel] had an obligation to timely produce the evidence, which was duly requested by the plaintiff in repeated discovery demands, and [s]he had been ordered by the court several times to do so or had voluntarily agreed to do so. At the very least, Defendants failed to make a good faith effort to search their files and to accurately and timely respond to discovery demands and to this court's orders. Thus, the obligation element of the adverse inference instruction analysis is met, whether the failure to produce was the result of spoliation or a discovery default.

*Creative Resources Group of N.J. v. Creative Resources*, 212 F.R.D. at *106. (emphasis added).

Third, before an adverse inference may be drawn, "there must be some showing that there is in fact a nexus between the proposed inference and the information contained in the lost evidence." *Turner*, 142 F.R.D. at 76; *See also Residential Funding Corp.*, 306 F.3d at 109 (To obtain an adverse inference, the party seeking the instruction "must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the part affected by its destruction.'") (citing *Kronisch*, 150 F.3d at 127).  The basic principle underlying this area of inquiry is, simply stated, that "the prejudiced party may be permitted an inference in his favor so long as he has produced some

21

evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." *Kronisch*, 150 F.3d at 127.  The bar for meeting this evidentiary burden, however, is not to be prohibitively high. *See Creative Resources*, 212 F.R.D. at 107 ("In discussing this element [relevance], the Second Circuit noted that courts must take care to not hold a party to too strict a standard of proof regarding the likely contents of the missing evidence, since to do so would 'subvert' the purposes of the adverse inference and 'would allow parties who have destroyed evidence to profit from that destruction.'") (quoting *Kronisch*, 150 F.3d at 128)).

*      *      *

The missing memo book entries and documents relating to radio correspondence about the underlying incident in this case could have been essential in doing a number of things: identifying potential witnesses, identifying the specific roles or actions of individual officers, affirming the Stephens' recollections, describing injuries, or indicating the conditions under which the Stephens were detained by Defendants.  Considering the fact that all nine Defendants in this case have claimed a lack of recollection of this incident, descriptions of this sort are of central importance to the Plaintiffs' case.  Defendants' admitted spoliation violations, along with their failure to produce other relevant documents, warrants an adverse inference instruction that such documents, if produced, would have contained evidence supporting the Stephens' case.

**III.  DEFENDANTS' UNTIMELY PRODUCTION OF MANDATORY RULE 26 DISCLOSURES CONCERNING THEIR EXPERT WARRANTS SANCTIONS.**

The Federal Rules of Civil Procedure require that parties seeking to introduce expert testimony must make certain *advance* disclosures regarding their expert witnesses.  In relevant part, FRCP 26(a)(2)(B) mandates that:

> [Expert] disclosure must be accompanied by a written report . . .
> [which] must contain (iv) the witness's qualifications, including a
> list of all publications authored in the previous ten years, (v) a list
> of all other cases in which, during the previous four years, the
> witness testified as an expert at trial or by deposition and (vi) a
> statement of the compensation to be paid for the study and
> testimony in the case.

Fed. R. Civ. P. 26.  Absent a "substantial justification", the sanction for failure to comply with

this rule is generally preclusion.  *See Giladi v. Strauch*, 2001 WL 388052, at *1 (S.D.N.Y. Apr.

16, 2001); *see also LaMarca v. United States*, 31 F. Supp. 2d 110, 122-23 (E.D.N.Y. 1998).  In

the alternative, Rule 37(c)(1) permits a court to order alternative relief, including "payment of

reasonable expenses, including attorney's fees, caused by the failure."  Fed. R. Civ. P.

37(c)(1)(A).

In the instant case, after Defendants' initial failure to produce their mandatory expert

disclosures, Plaintiffs gave Defendants an opportunity to cure their omissions and make the

disclosures mandated by FRCP 26(a)(2)(B).  *See* Ex. 19.  In response, however, Defendants

refused to provide the required information.  *See* Ex. 20.  Although Defendants have belatedly

provided Plaintiffs with Dr. Weintrob's testifying history, it comes eight months after his

deposition, and just days before the motion *in limine* deadline.

Defendants' late production of their mandatory expert disclosures is far from harmless.

The fact is that, by refusing to disclose Dr. Weintrob's testifying history until long after his

deposition (and all discovery deadlines) have passed, Defendants have deprived Plaintiffs of the

opportunity to make their own judgments about the relevance of his testifying history to the

instant case, and the opportunity to question him regarding his former testimony.  *See Castaldi v.

Land Rover N. Am., Inc.*, 2007 WL 4165283, at *5 (E.D.N.Y. Nov. 21, 2007) ("[D]eposition

testimony does not cure deficiencies in the Rule 26(a)(2)(B) notice.").  As such, Plaintiffs'

ability to test the consistency of Dr. Weintrob's testifying history has been hopelessly prejudiced.

*See Giladi*, 2001 WL 388052, at \*6 ("defendants have been prejudiced. The trial date is approximately six (6) weeks away. Defendants still do not have a complete list of the cases in which plaintiff's experts have testified …. To permit plaintiff to complete his Rule 26(a)(2) discovery at this late date would require defendants to complete depositions of both of plaintiff's experts, formulate rebuttal reports, provide defendants' own experts for deposition, and prepare for the trial of this matter. *There is no reason why defendants should be compelled to complete the foregoing tasks on an expedited basis because plaintiff has chosen to ignore his discovery obligations*.") (emphasis added).  In light of Defendants' express refusal to comply with their expert disclosure obligations and the prejudice to Plaintiffs caused by their eventual, very late production, Plaintiffs request that this Court, as an alternative to the preclusion of Dr. Weintrob's testimony, order Defendants to pay Plaintiffs' reasonable expenses and fees relating to the protracted letter and motion practice required to procure Defendants' Rule 26(a) disclosures, as well as any supplemental deposition discovery costs, in connection with a potential re-opening of Dr. Weintrob's deposition.

## **CONCLUSION**

Defendants have repeatedly failed to comply with their discovery obligations, the Federal Rules of Civil Procedure, and Court Orders relating to the preservation and production of documents in this case.  They have failed to produce some documents, admitted to destroying others, and have forced Plaintiffs to engage in protracted motion practice to procure evidence long after discovery deadlines expired.  This pattern of dilatory and obstructive behavior warrants spoliation sanctions in the form of 1) adverse inference instructions regarding documents destroyed or not produced; 2) an order pursuant to FRCP 37(c)(1)(A)-(C), directing Defendants to pay both Plaintiffs' reasonable expenses and fees incurred both in compelling

discovery that should have been produced long ago, as well as supplemental discovery costs or

fees (i.e., re-opening depositions) that are required as a direct result of Defendants' discovery

violations.

Dated: New York, New York
      January 30, 2009

                         Joseph De Simone
                         David McGill
                         Shane B. Kelbley

                         MAYER, BROWN LLP
                         1675 Broadway
                         New York, New York 10019
                         (212) 506-2500

                         *Attorneys for Plaintiffs*